

The following constitutes the order of the Court.
Signed: January 12, 2023

_____
**William J. Lafferty, III**
**U.S. Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: Mariner Health Central, Inc**,** et al. | Case No.:  22-41079 WJL<br>(Jointly Administered) |
| In Re: Parkview Operating Company, LP | Case No.: 22-41080 WJL |
| In Re: Parkview Holding Company GP, LLC | Case No. 22-41081 WJL<br><br>Date:      December 21, 2022<br>Time:      2:30 p.m.<br>Location: 1300 Clay Street, Courtroom 220<br>              Oakland, CA<br>Judge:    William J. Lafferty, III |

**MEMORANDUM DECISION DENYING THE MOTION OF THE DEBTORS FOR AN ORDER EXTENDING THE AUTOMATIC STAY, OR IN THE ALTERNATIVE GRANTING INJUNCTIVE RELIEF, TO STAY PROSECUTION OF CERTAIN ACTIONS AGAINST NON-DEBTOR AFFILIATES**

1

# INTRODUCTION

This matter came for hearing at the above referenced date and time on the Motion of the Debtors for an Order Extending the Automatic Stay, or in the Alternative Granting Injunctive Relief, to Stay Prosecution of Certain Actions Against Non-Debtor Affiliates (the "Covered Actions Motion") (ECF #72). The Covered Actions Motion was made by Mariner Health Central, Inc. ("Mariner Central"), Case No. 22-41079, Parkview Operating Company, LP ("Parkview"), Case No. 22-41080, and Parkview Holding Company GP, LLP ("Parkview Holdco," and collectively, the "Debtors"), Case No. 22-41081, and with reference to that certain Complaint filed in AP No. 22-04050, the "Covered Actions Complaint." David Forsh of Raines Feldman LLP appeared for the Debtors as moving parties. Ori Katz of Sheppard, Mullin, Richter and Hampton LLP appeared for the Unsecured Creditors Committee (the "Committee") as an objecting party; Stephen Finestone of Finestone Hayes LLP appeared for various defendants (the "Plaintiffs Group")[1] also as objecting parties.

The Covered Actions Complaint contains two claims for relief. The First Claim seeks an extension of the automatic stay (Sections 362(a)(1) and (a)(3)[2] of the Bankruptcy Code) to prevent

---

[1] These defendants, defined as the "Personal Injury Claimants" at section II.B, *infra*, include Filmon Arzeta, Feleai Ah-Hing, Sandra Cearley as GAL for James Cearley, Jr., Maricela Ledesma, Celina Ledesma, Alberto Ledesma, David Ledesma, Alejandro Ledesma, Esther Ledesma, Araceli Ledesma, Esmeralda Ledesma, Robert McCalope as GAL for Frances McCalope, Henry Rice, Jesse Garrett, Janet Horrobin, James Martin, Teresa Meadors, Chrstine Vassis, Christopher Paul Tucker, Jason Tucker, Casey Tucker, Stephen Tucker, Kyu Chung, Susan Myung Won, Soon Choi Hyo, Young Jung Hyo, Brian Byung Hwa Chung, Tracy Jackson, Avis Dewalt, Davonte Barfield, Paula Greene, Dana Coward-Greene, Marcus Moore, Nancy Sanchez, Joe Sanchez, Jr., Eddie Sanchez, Robert Seelig as GAL for John Seelig, Lisa Cabrerra, Matthew Sira, Devon Taylor, Trinian Taylor and Chanova Wilson. Three other defendants, defined as the "Employment Discrimination Claimants" at section II.B, *infra*, are not represented by Mr. Finestone and include Maria Contreras, Scott Cook, and Ana Marie Flores. These groups of claimants together comprise the "Covered Actions Defendants."

[2] Although the Covered Actions Complaint originally sought to extend the automatic stay to the non-debtor affiliates (NDAs) on the theory that continuing to prosecute the Covered Actions would deplete the Debtors' insurance policies and thus constitute an act to obtain possession or control of estate property within the meaning of Section 362(a)(3) of the Code, Covered Actions Motion at 2, 12, 16, Debtors later acknowledged that that assertion was made in error—Debtors have no insurance coverage that would be relevant to the Covered Actions. Debtors' Reply ISO the Covered Actions Motion at 2 n. 3.

continuation of the Covered Actions against certain non-debtor affiliates ("NDAs") of the Debtors and certain other parties, who are named defendants in those actions. The Second Claim seeks a preliminary injunction pursuant to Section 105(a) of the Code to the same effect (i.e., to prevent continuation of the Covered Actions against the NDAs and others). The Debtors have pursued this relief via the Covered Actions Motion that specifies that in each case, the relief sought is for a relatively short duration, 60-to-90 days, to permit the Debtors to make progress on formulating and proposing a plan of reorganization, free of the burdens of having to address issues likely to arise in the Covered Actions, and free of the risk of adverse and potentially preclusive determinations in the Covered Actions. Hearing Held Dec. 21, 2022, Case No. 22-41079 (ECF #314) (Debtor, Committee, Plaintiffs Group, and Court discussing a stay of 60-to-90 days).

For the reasons set forth below, the Court declines to apply Section 362(a)(1) to extend the automatic stay to the Covered Actions. The Court also declines to grant the Debtors' request for a preliminary injunction, although as explained in greater detail at section III.C, *infra*, this disposition is without prejudice to a subsequent request by Debtors based on a more favorable record.

## I. **Jurisdiction**

No party has challenged this court's jurisdiction to hear and determine the claims asserted in the Covered Actions Complaint, or the relief sought by the Covered Actions Motion. This acquiescence notwithstanding, the Court has an independent duty to ensure that it has jurisdiction to hear and determine these matters. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction.") (citation omitted); *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1092–93 (9th Cir. 2007) ("[W]e

3

have an independent obligation to inquire into the presence or absence of subject matter jurisdiction.") (citation omitted).

The Court concludes that it has jurisdiction over both the First Claim and the Second Claim, and necessarily, the Covered Actions Motion, pursuant to 28 U.S.C. § 1334(b). The Court also concludes that the First Claim is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) (matters pertaining to the automatic stay), and the Second Claim is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (L) (matters pertaining to the administration of the estate, and to the confirmation of plans). As stated in greater depth in the discussion of the request for a preliminary injunction at section III.B, *infra*, the Court concludes that the Second Claim is, at a minimum, related to these Bankruptcy Cases, because the continued prosecution of the Covered Actions might eventually have an effect on the estate at least of Mariner Central in a manner that is sufficient to provide at least that level of jurisdiction. *In re Excel Innovations, Inc.*, 502 F.3d at 1096 (a bankruptcy court has jurisdiction "whenever an action in another forum 'could conceivably have any effect on the administration of the bankruptcy estate'"). Accordingly, the Court has no doubt but that the injunctive relief request is, at a minimum, related to the Debtors' bankruptcy cases, and the Court would therefore have jurisdiction to hear the matter.

Of course, as the *Excel* case also makes clear, it is one thing for the Court to determine that is has "related to" jurisdiction to hear and determine questions concerning whether to grant injunctive relief in favor of non-debtors in light of the flexible standard utilized in this Circuit for such determinations; it is another thing entirely, as demonstrated by the analysis at section III.B, *infra*, to conclude that the relatively demanding standards for the granting of injunctive relief have been met. *Id*. ("Whether the bankruptcy court has subject matter jurisdiction is a distinct question from whether an injunction should issue. The two inquiries cannot be identical.").

4

In any event, even were the Second Claim to be determined to be merely "related to" the Debtors' bankruptcy cases, and thus "non-core," the Answers to the Covered Actions Complaint also indicate that the responding parties consent to this Court's entry of final orders disposing of the Covered Actions Complaint.

And although the Covered Actions Motion was brought in the Debtors' main bankruptcy cases, as opposed to in the Adversary Proceeding, Case No. 22-04050, no party has suggested that that process prevents this Court from resolving the Covered Actions Motion.

Venue is appropriate in this district pursuant to 28 U.S.C. § 1409(a).

## II. **Factual and Procedural Background**[3]

### A. The Mariner Health Group Entities.

The Debtors in these jointly administered cases are affiliates with and members of a corporate family which oversees, manages, and operates twenty skilled nursing facilities (the "facilities" or "operators") located throughout California (collectively, for convenient reference, "Mariner Health Group"). Several of the health care facilities are operated by an operating entity formed as either a limited liability partnership or limited partnership, Dec. Kristy Owen ISO the Covered Actions Motion at 5 [hereinafter "Owen Dec. ISO Motion"], with another Mariner entity as its general partner and owner of a one percent (1%) interest in the operating company,[4] Dec.

---

[3] For the most part, the factual basis for this section is taken from the Covered Actions Motion, the responses thereto, and the various parties' declarations and accompanying documents offered in support of those pleadings. In addition, the Court has exercised its discretion to review and incorporate factual background materials from other pleadings on file in these cases or in the adversary proceedings referred to herein. In doing so, the Court does not "adopt" any such statements for the purposes of validating the ultimate correctness of any such statements, some of which may be subject to appeal or continuing disputes. Rather, citation of such materials is merely indicative of the historical fact that certain events have occurred or certain determinations have been made by other courts.

[4] The other known operators and holding companies include: Almaden Operating Co., LP, California Long Term Care, LLC, Fruitvale Long Term Care, LLC, Fruitvale Operating Co., LP, Fruitvale Holding Company GP LLC, Fruitvale Healthcare Holdings, LLC, Fruitvale Healthcare Realty, LLC, Fruitvale Operating Co., LP, Monterey Palms Holding Co. GP, LLC, Monterey Palms Operating Co., LP, Santa Monica Holding Company, GP, LLC, Santa Monica Holding Co. GP, LLC, Santa Monica Operating Company, LP, San Marcos Operating Co., LP, San Rafael Operating Co., LP, San Rafael Operating Co. GP, LLC, Skyline San Jose Operating Co., LP, and Vale

Lawrence Perkins ISO First Day Plds. [hereinafter "Perkins. Dec."]. Debtor Parkview is a 121-bed facility located in Hayward, CA, whose general partner is Debtor Parkview HoldCo, *id*. at para. 7–10. Debtors are incorporated in Delaware.

In broad terms, within the Mariner Health Group, twenty facilities "serve residents with shorter-term rehabilitation needs and with longer-term nursing care needs," in service of which Mariner Health Group employs approximately 3,100 employees, most of whom are skilled professionals including nurses, nursing aides, and other allied health professionals. Perkins Dec. at para. 9–10. Debtors in particular employ approximately 200 individuals located predominantly in California, but also in Georgia, Maryland, and Texas. *Id.* at 10.

Atop these thirty-plus facilities, operators, and holding companies are various other affiliated entities, each of which is a wholly owned subsidiary of the ultimate parent, National Senior Care, Inc. ("National Senior Care"). Below National Senior Care are at least six other corporate entities: National Senior Care owns Mariner Health Care, Inc., which in turn owns MHC Holding Company ("MHC HoldCo"); MHC HoldCo in turn owns MHC West Holding Company, and that entity owns GranCare LLC ("GranCare"); GranCare owns GC Operating Company ("GC OpCo"), which finally owns GC Holding Company 2 LLC ("GC HoldCo 2"). GC HoldCo 2 is a 99% limited partner in each of the operating companies, including Debtor Parkview.

While the precise function of many of these non-operator companies is unclear, it is clear that Debtor Mariner Central and two other NDAs, Fundamental Administrative Services ("FAS") and Bio-Pacific, LLP ("Bio-Pacific"), provide services to all operators.

---

Operating Co. *See generally* Supp. Dec. of Kristy Owen ISO Debtors' Reply ISO Covered Actions Motion [hereinafter "Supp. Owen Dec. ISO Motion"]. Each of these companies are in California.

Mariner Central plays a fundamental role in the day-to-day operations of the twenty facilities. Mariner Central is party to twenty separate, independent contracts (the "Support Agreements") with each operator through which Mariner Central provides administrative and operational support services. These Support Agreements are essentially identical in substance and state that Mariner Central is responsible for providing payroll administration services, book-keeping and accounting, billing and collections, Medicaid and Medi-Cal reimbursements, in-house legal services, and other similar services. Perkins Dec. at para. 14. It is clear that Mariner Central is an important cog in the Mariner Health Group's wheel.

Non-debtor affiliate FAS is a subcontractor of Debtor Mariner Central that provides "back-office" operational and administrative support services to each operator on behalf of Mariner Central. These services include (1) ensuring compliance with federal requirements imposed by the Health Insurance Portability and Accountability Act ("HIPAA"); (2) managing the accounts payable process and ensuring disbursement of funds; (3) preparation of the operators' budgets and historical financing information; and (4) provision of certain computer systems and technological tools necessary for cost processing; and other key functions.[5] FAS has a physical location and employees in Maryland.

Bio-Pacific acts as an in-house entity that provides occupational, physical, and other therapeutic services to residents of each of the operating companies. Mariner Central then pays Bio-Pacific for its services on behalf of the operators.[6]

---

[5] Pl. Opp. to Def. Mtn. to Quash Service of Summons at 14–15, *Ledesma v. Mariner Health Care, Inc.*, Case No. RG19-025110 (Sup. Ct. Cal., Alameda Cty., Oct. 16, 2020). The *Ledesma* case is a personal injury suit against Debtors that preceded Debtors' bankruptcy petitions. *See* section II.B, *infra*.
[6] *See* Pl. Designation Evidence ISO Alter Ego and Single Enterprise Liability, *Ledesma v. Mariner Health Care, Inc.*, Case No. RG19-025110 (Sup. Ct. Cal., Alameda Cty., Oct. 21, 2022).

Although nominally distinct legal entities, it appears that the various companies in the Mariner Health Group are in some manner treated as a unit. Most prominently, and as also observed by Judge Selber-Silverstein of the Bankruptcy Court for the District of Delaware, the judge to whom these cases were originally assigned, in connection with the hearing on the Motion of Debtors for Interim and Final Orders Authorizing Debtors to Continue Use of Existing Bank Accounts, Cash Management System and Business Forms, and Granting Related Relief (ECF #7), there did not appear to be separate and discrete accounting systems for each corporate entity—rather, revenues seem to have been pooled into one account, making it difficult to assess the income and expenses, and the financial performance, of the various operating facilities. Transcript at 56, Case No. 22-41079 (ECF #55).[7] In addition, and as at least referenced in the Application Pursuant to 11 U.S.C. § 327(e) and Fed. R. Bankr. P. 2014(a) and 2016 for Order Authorizing the Employment of Pillsbury Winthrop Shaw Pittman LLP as Counsel to the Independent Director, Case No. 22-41079 (ECF #189), there may be reason to believe that monies were up-streamed to non-operational affiliates or otherwise transferred to third parties such that the Debtors may have claims to avoid or to recover such transfers.

**B. Prepetition, Debtors and at least Twenty Non-Debtor Affiliates Were Named in at least Thirty-Five Lawsuits.**

Prior to the commencement of these bankruptcy cases, Debtors and the NDAs were defendants in numerous lawsuits filed in California state courts. More particularly, the Debtors' Responsible Individual stated that as of the petition date for these cases, at least twenty of the

---

[7] *See* Order Conditionally Granting in Part and Denying in Part Def. Mtn. for New Trial and Order Re: Remittitur of Damages at 4–5, *Ledesma v. Mariner Health Care, Inc.*, Case No. RG19-025110 (Cal. Sup. Ct., Alameda City., Mar. 21, 2022). Judge E. Grillo noted that "[t]he evidence showed that [Debtors] kept Mariner [Central's] and Parkview's financial records and books in a consolidated form that made it very difficult to determine" specific financial information about each entity. *Id.* Judge Grillo further noted that "[Debtors'] bookkeeping and record keeping methodologies were not transparent." *Id.* at 5.

8

Mariner Health Group entities along with numerous employees were defendants in at least thirty-five lawsuits. Perkins Dec. at para. 23.

### 1. The Personal Injury Claimants Assert Various Personal Injury, Wrongful Death, and Related Tort Actions Against Debtors, NDAs, and Employees of Both.

The majority of the prepetition lawsuits were brought by the Personal Injury Claimants alleging various torts resulting in personal and emotional injury and wrongful death.[8] These claimants also sought compensatory and punitive damages for statutory violations of California's Health and Public Safety Code and the Welfare and Institutions Code.[9] The Personal Injury Claimants include (a) current residents, (b) former residents, and (c) the estates and/or family members of former residents of various non-debtor skilled nursing facilities.

The only prepetition action to have proceeded to judgment involves the Debtors in these cases. That action is referred to by the parties as the "Ledesma Action." *Ledesma v. Mariner Health Care, Inc.*, Case No. RG19-025110 (Sup. Ct. Cal., Alameda Cty.). In the Ledesma Action, the Alameda County Division of the California State Superior Court (the "Trial Court") consolidated into a single case ten different actions brought by ten different plaintiffs (the "Ledesma Action Plaintiffs"), each of whom either currently or formerly lived in the facility operated by Debtor Parkview. Six of these plaintiffs removed their claims to arbitration, which is scheduled to commence in mid-2023. Perkins Dec. at para. 24 n.6, para. 25.

The consolidated complaint alleged violations of state and federal regulations designed to protect residents of skilled nursing facilities as well as numerous torts resulting in personal injury

---

[8] *See* Supp. Owen Dec. ISO Motion, Exs. 23–25, 28, 31–39 (providing each complaint from which Debtors seek relief).
[9] *See id.*

and wrongful death.[10] Third Amended Complaint, *Ledesma v. Mariner Health Care, Inc.*, Case No. RG19-025110 (Cal. Sup. Ct., Alameda Cty., June 29, 2020).

On December 30, 2021, after a four-phase and multi-day jury trial, the Ledesma Action Plaintiffs were awarded approximately $14 million in compensatory and punitive damages and their counsel were awarded approximately $6.6 million in attorneys' fees and costs (the "Ledesma Action Judgment"). Following entry of the jury verdict, Debtors obtained a remittitur that reduced the Ledesma Action Judgment to approximately $8 million. Perkins Dec. at para. 25. Although these plaintiffs named numerous Mariner Health Group entities as defendants, the Trial Court allowed the jury to consider the liability of only Debtors Mariner Central and Parkview.[11]

Notably, the jury apportioned 60% of the liability directly to Mariner Central and 40% directly to Parkview, at least in part because the jury determined Mariner Central to be a "caretaker or custodian" of the Ledesma Action Plaintiffs under California's Elder Abuse Act, CAL. WELF. & INST. CODE § 15610.57, et seq. Order Re: Entry Judgment on Jury Verdicts at 2–3, Case No. RG19-025110 (Cal. Sup. Ct., Alameda Cty., Apr. 15, 2022).

In addition to monetary damages, the Trial Court also issued an injunction "requiring Parkview to comply with applicable staffing and specified health and safety statutes or regulations, imposing periodic reporting requirements, and providing for the appointment of" an independent

---

[10] *Id.* at Ex. 23

[11] Order Granting Def. Mtn. to Quash Service Summons for Lack Personal Jurisdiction, Case No. RG19-025110 (Cal. Sup. Ct., Alameda Cty., Dec. 30, 2020). The Trial Court found that it lacked personal jurisdiction over the following Mariner Health Group companies: Mariner Health Care Management Company, Mariner Health Care, Inc., MHC West Holding Company, National Senior Care, Inc., GC HoldCo 2, and FAS. *Id.* at 1. The Ledesma Action Plaintiffs argued that each of these entities was subject to liability as the corporate decision-maker and/or based on an alter ego and single enterprise theory. Plf. Designation Evidence ISO Alter Ego and Single Enterprise Liability, Case No. RG19-025110 (Cal. Sup. Ct., Alameda Cty., Oct. 26, 2021). Because of the jurisdictional question, the Trial Court did not make a determination on the alter ego liability.

monitor "to ensure such compliance." Perkins Dec. at para. 27. The Trial Court stayed enforcement of this judgment until September 22, 2022.[12]

Debtors filed their appeal of the Ledesma Action Judgment immediately prepetition. On November 29, 2022, this Court granted Debtors and the Ledesma Action Plaintiffs relief from the automatic stay to continue their respective appeal and cross-appeal of the Ledesma Action Judgment in state court.[13]

Besides the Ledesma Action, there are thirteen other suits brought by Personal Injury Claimants against Debtor Mariner Central, other non-debtor affiliated corporate entities and facilities, and Mariner Health Group employees.[14]

While Debtors argue that continued prosecution of the above actions would irreparably harm their reorganization efforts, Debtors also acknowledge that each of these actions is in the early discovery process and that no final judgment or dispositive order is imminent in any of these matters. Covered Actions Motion at 7. The fact that these actions are in their early stages notwithstanding, counsel to certain of the Personal Injury Claimants have indicated that settlement negotiations had been initiated prepetition. Obj. to Covered Actions Motion [hereinafter "Plaintiffs Group Obj."], Case No. 22-41079 (ECF #269).[15] Of course the fact that settlement negotiations had been commenced does not necessarily indicate that any of these matters were in any sense advanced in terms of the discovery process, let alone that they would be anywhere near a judicial determination of any sort.

---

[12] The Debtors filed their bankruptcy petition three days before this date, on September 19, 2022.
[13] Case No. 22-41079, Minute Entry (Nov. 29, 2022).
[14] For each of those complaints, see FN 8, *supra*. For a complete list of these other prepetition suits, see Appendix A.
[15] According to Mr. Finestone, the Plaintiffs in the *Greene* and *Tucker* actions had initiated settlement discussions. Plaintiffs Group Obj. at 4.

### 2. Current and Former Employees Assert Employment Discrimination Claims Based on State Statutory Violations.

While the Ledesma Action is the most financially significant case reduced to judgment prepetition, former or current employees of Debtor Mariner Central and non-debtor facilities brought prepetition actions alleging disability discrimination, wrongful termination, and other employment discrimination claims.[16]

Debtors also assert that these employment discrimination suits have not progressed past initial discovery. Covered Actions Motion at 7.

### C. Debtors Filed the Instant Petitions to Appeal the Ledesma Action and Halt Prepetition Lawsuits.

Following entry of the Ledesma Action Judgment, Debtors filed these Chapter 11 Bankruptcy Cases in the District of Delaware (the "Delaware Court") on September 19, 2022.[17] The Cases were originally assigned to Judge Laurie Selber-Silberstein, who granted a Motion for Joint Administration. Case No. 22-41079 (ECF #31). Concurrently with their petitions, Debtors also filed three adversary complaints, and a motion in each adversary proceeding and in the lead case, seeking either to extend the automatic stay to non-debtor affiliates or to enjoin prepetition litigation from continuing against these same affiliates.[18]

---

[16] Supp. Owen Dec. ISO Motion at Ex. 26, 27, 29, and 30. For a list of these actions, see Appendix B.

[17] Debtors filed the instant petitions because the Ledesma Action Judgment "far exceeds the Debtors' financial capacity to satisfy the judgment." Perkins Dec. at 3. Filing bankruptcy also enabled Debtors to file their appeals of the Ledesma Action, which may not have had the funds to initiate, because California law requires a bond payment of one and one-half times the amount of the judgment in order for a party to appeal a civil judgment. CAL. CIV. PRO. CODE § 917.1.

[18] The three adversary complaints are: (1) the Covered Actions Complaint, (2) the People of the State of California ("PSC") Complaint, *Mariner Health Central v. People of the State of California*, AP No. 22-04052 (ECF #1), and (3) the Integra Complaint, *Mariner Health Central, Inc., v. United States of America ex rel. Integra Med Analytics LLC*, AP No. 22-04051 (ECF #1). Only the Covered Actions Complaint is at issue here. The parties voluntarily dismissed the Integra Complaint under Fed. R. Civ. Pro. 41(a)(1)(A)(ii) on December 14, 2022. AP No. 22-04051 (ECF #50).

One of the referenced adversary proceedings was filed against the People of the State of California, who on April 8, 2021, had commenced an action against Debtors, non-debtor corporate entities, and certain employees of Debtors and non-debtor affiliates, alleging violations of state and federal laws regulating the operation of skilled nursing facilities. *People of the State of California v. Mariner Health Care Inc.*, Case No. RG21-095881, Sup. Ct. Cal. (Alameda Cty.) (hereinafter, the "PSC Action").

The PSC Action is ostensibly not subject to the automatic stay because that action is an exercise of a state's police and regulatory powers; however, the Court intends to monitor the PSC Action relatively closely. It appears that at least for now the parties to the PSC Action intend to work through a consensual resolution of the issues raised therein. To the extent that any resolution would involve material changes to the services to be provided by Parkview or Mariner Central, clearly such a resolution could have a material impact on Parkview's operations and could be a very important factor in determining the requirements of a plan of reorganization and such a plan's feasibility.

The Ledesma Action Plaintiffs moved to transfer venue from the Delaware Court to the Northern District of California. Motion to Transfer Venue of Bankruptcy Cases to the United States Bankruptcy Court for the Northern District of California Oakland Division (ECF #76) [hereinafter "Motion to Transfer Venue"]. The People of the State of California (ECF #80), and the Official Committee of Unsecured Creditors (the "Committee") joined the Motion to Transfer Venue, while the Committee also filed its own motion, The Official Committee of Unsecured Creditors' Motion and Joinder to Transfer Venue of the Debtors' Chapter 11 Cases to the United States Bankruptcy Court for the Northern District of California, Oakland Division (ECF #120).

After thorough briefing and argument on the matter, the Delaware Court granted the motion and transferred venue to this Court. Order Granting Motion to Transfer Venue (ECF #160).

Two other developments bear mention. First, the U.S. Trustee appointed the Committee before the Delaware Court granted the Motion to Transfer Venue. The Committee consists of seven individuals or entities, including four of the Personal Injury Claimants, one of the Employment Discrimination Claimants, one trade creditor, and Integra Med Analytics, LLC.[19] Notice of Appointment of the Committee (ECF #83), Case No. 22-41079. Some of these Personal Injury Claimants were parties to the Ledesma Action.

Second, Debtors Mariner Central and Parkview HoldCo have appointed Craig Barbarosh as an independent director and independent manager (the "Independent Director"). Mr. Barbarosh is a partner in the Insolvency and Restructuring group at Katten Muchin Rosenman LLP with prior experience representing debtors and creditors in complex restructuring and bankruptcy proceedings.[20] As counsel for the Independent Director, Debtors have retained the law firm Pillsbury Winthrop Shaw Pittman LLP. Order Granting Application Pursuant to 11 U.S.C. § 327(a), Case No. 22-41079 (ECF #244).

### III.  Discussion

Debtors seek either an extension of the automatic stay under Section 362(a)(1) of the Code or a preliminary injunction under Section 105(a) of the Code to halt at least momentarily the prosecution of the Covered Actions against the NDAs. This relief is requested based on: (1) the

---

[19] Namely, the members of the Committee include the following Personal Injury Claimants: (1) James Cearley, Jr., by and through his G.A.L. Sandra Cearley, (2) Lisa Cabrera *ex rel.* Louis Sira, (3) Nancy Sanchez *ex rel.* Jose Sanchez, and (4) Ronald Bernstein *ex rel.* Margo L. Each of these individuals is represented by counsel. The counsel representing Mr. Cearley and Ms. Cabrera are the same attorneys who litigated the Ledesma Action. Additionally, the Committee includes Employment Discrimination Claimant Scott Cook and trade creditor Skypower Secure Solutions, Inc., which provides security services to Debtor Parkview.

[20] *About Craig A. Barbarosh*, Katten, https://katten.com/Craig-Barbarosh (accessed January 5, 2023).

burden of discovery and litigation that will detract from Debtors' reorganization efforts; (2) the threat of an unfavorable determination against the NDAs, which would result in indemnification claims against Debtors; and (3) the threat of estoppel, preclusive effects, or prejudice from continued discovery and litigation. Covered Actions Motion at 1–2; Debtors' Reply ISO Covered Actions Motion at 1; Owen Dec. ISO Motion at 7.

Rather than attacking generally the Court's ability to grant such relief, or the broader reasoning that might support such relief, the Committee and the Plaintiffs Group focus on what they assert is the Debtors' failure to demonstrate the existence of one of the factors necessary for granting an injunction: the threat of irreparable harm to Debtors.

In any event, granting either form of relief is without doubt an extraordinary remedy. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)); *see Queenie, Ltd. v. Nygard Intern.*, 321 F.3d 282, 287–88 (2nd Cir. 2003) (extending the stay is an abnormal remedy). Though such relief is not impossible to obtain, the Court is mindful of the effects of extending such relief to reach entities that have chosen not to file bankruptcy, but still wish to avail themselves of the benefits of an automatic stay, while simultaneously avoiding the disclosure obligations and fiduciary duties of a chapter 11 debtor-in-possession. For these reasons, courts must exercise caution when determining whether such extraordinary relief is warranted and may grant such relief only on a clear showing of entitlement thereto. *Winter*, 555 U.S. at 22.

### A. Debtors' Request to Extend the Automatic Stay to the NDAs.

Any discussion of whether to extend the automatic stay to a party other than the Debtor must begin with an acknowledgement: Congress granted debtors a stay, not non-debtors. 11

U.S.C. § 362(a); s*ee In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 246 (9th Cir. 1994) ("As a general rule, '[t]he automatic stay of section 362(a) protects only the debtor, property of the debtor or property of the estate. It does not protect non-debtor parties or their property.'") (citing *Advanced Ribbons & Off. Prods. v. U.S. Interstate Distrib. (In re Advanced Ribbons & Off. Prods.)*, 125 B.R. 259, 263 (BAP 9th Cir. 1991). But while the stay automatically protects debtors, it is also expressly subject to modifications of almost limitless flexibility. Notably, "on request of a party in interest . . . the court shall grant relief from the stay . . . such as by terminating, annulling, modifying or conditioning such stay." 11 U.S.C. § 362(d). Thus, bankruptcy courts should be able to condition the extension of a stay to a non-debtor, or provide an essentially equivalent remedy, in a similarly flexible fashion. Nonetheless, courts should be very careful about extending the stay.

Courts extending the stay to protect non-debtors have cited "unusual circumstances" that they believe warrant such extraordinary relief. *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) (citing *In re Johns-Manville Corp.*, 26 B.R. 405, 410 (Bankr. S.D.N.Y. 1983)). The courts that have granted an extension of the automatic stay have generally done so under the rubric that the actions to be enjoined by such an extension are so "intertwined" with actions against the debtor, that are subject to the automatic stay, that failure also to enjoin the actions against non-debtors would essentially lead to a determination of liability against the debtor, or similarly frustrate the purpose of the stay, to provide the debtor with a breathing spell to permit them to attempt to reorganize, free of the pressures of aggressive creditors. *In re Bloom*, 875 F.2d 224, 226 (9th Cir. 1989) ("The automatic stay is intended to give 'the debtor a breathing spell from his creditors.'") (citing S.Rep. No. 989, 95th Cong., 2d Sess. 54, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5840); *In re Roach*, 660 F.2d 1316, 1318 (9th Cir.

1981); *In re Schwartz-Tallard*, 473 B.R. 340, 348 (BAP 9th Cir. 2012); *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918, 925 n.9 (Bankr. N.D. Cal. 1994).

Simple examples of these "unusual circumstances" include situations in which a creditor may be pursuing an individual or entity who had guaranteed the performance of the debtor's obligations, *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 510–11 (3d Cir. 1997); *Seybolt v. Bio-Energy of Lincoln, Inc.*, 38 B.R. 123 (D. Mass. 1984), or where a creditor, though unable to prosecute its claim against a corporate debtor, sought to pursue a factually similar claim against an officer or director of the debtor (or even sought to burden the officer or director with numerous discovery requests), *In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1150–51 (5th Cir. 1987); *see In re MortgageAmerica*, 714 F.2d 1266, 1277 (5th Cir. 1983).

More complex examples of these "intertwined" claims include scenarios in which the debtor and a non-debtor may be jointly liable for an asserted claim, and where the liability may be apportioned between them based upon their respective alleged duties and respective fault. *In re Dow Corning Corp.*, 86 F.3d 482, 488–90 (6th Cir. 1996) (finding that the district court had "related to" jurisdiction to hear claims against joint tortfeasors sued as codefendants of the debtor because the personal injury claims against non-debtors affected property of debtor's estate).

It is not difficult to conceive scenarios in which continued prosecution of the Covered Actions might ultimately affect liability claims against Mariner Central, even if shielded from direct prosecution because of the stay—though the imminence of the harm is a significant factor in the analysis of whether to grant a preliminary injunction—and relief under a stay extension rubric might seem available. And courts outside the Ninth Circuit have granted such relief. *Queenie, Ltd. v. Nygard Intern.*, 321 F.3d 282, 288 (2nd Cir. 2003) (extending the automatic stay to a non-debtor wholly owned subsidiary of debtor, where adjudication of a claim against the

Case: 22-41079    Doc# 341    Filed: 01/12/23    Entered: 01/12/23 10:13:34    Page 17 of 44

former would materially and adversely affect the estate of debtor); *McCartney v. Integra Nat. Bank N.*, 106 F.3d at 510–11 (extending the automatic stay to a non-debtor third party where creditor could not pursue a deficiency judgment against that non-debtor without naming debtor as respondent); *A.H. Robbins Co.*, 788 F.2d at 999 (extending the automatic stay to non-debtor whose interests are "inextricably intertwined" with those of debtor).

However, as the Ninth Circuit has repeatedly stated, the availability of relief by extending the stay due to the purported "unusual circumstances" test is at best uncertain. *Chugach Forest Prods.*, 23 F.3d at 247; *see In re Lockard*, 884 F.2d 1171, 1179 (9th Cir. 1989). Rather, the Ninth Circuit has stated its clear preference that debtors pursue extraordinary relief in favor of non-debtors through the more traditional and well settled remedy of injunctive relief. *In re Excel Innovations, Inc.*, 502 F.3d at 1096.

And even while declining to indulge the stay extension path to such relief, the Circuit has also acknowledged the substantial conceptual overlap between the basis for extending the stay and the entitlement to injunctive relief. *Id.* ("[S]tays under the [unusual circumstances doctrine], 'although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court.'") (citing *Chugach Forest Prods.*, 23 F.3d at 247 n.6)). Recognizing the Circuit's at least implicit directive, both the Debtors and the Committee and the Plaintiffs Group have focused their arguments on whether the Debtors have satisfied the test for an award of injunctive relief. Covered Actions Motion at 16–23; Prelim. Consol. Obj. at 11–14; Plaintiffs Group Obj. at 6–8.

Accordingly, the Court declines to grant the Covered Actions Motion to the extent that Debtors seek an extension of the automatic stay under Section 362(a), and focuses on Debtors' request for injunctive relief under Section 105(a).

18

**B. Debtors' Requests for a Preliminary Injunction.**

Injunctive relief is extraordinary, and should be granted sparingly, and only to the extent that the standards for such relief are satisfied and to the extent necessary to achieve the purpose of injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Courts apply a four-part test when evaluating the propriety of granting injunctive relief: (a) has the proponent demonstrated a likelihood of success on the merits; (b) has the proponent demonstrated that there is a likelihood that they will suffer irreparable harm in the absence of injunctive relief; (c) do the balance of hardships tip in favor of one party or the other; (d) would granting the injunctive relief further public policy? *Id.* at 20.

Review of the case law on this subject makes clear that the most important factors in this test are "likelihood of success on the merits" and "presence of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d at 1093; *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999); *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999). This principle is equally true in the bankruptcy context, with one clarification concerning the proper application of the likelihood of success on the merits factor in bankruptcy: in the Chapter 11 context, "likelihood of success" means the likelihood of a successful reorganization. *In re Excel Innovations, Inc.*, 502 F.3d at 1095.

As the Court and the parties discussed during oral argument on the Covered Actions Motion, the cases that have analyzed the entitlement to injunctive relief in favor of non-debtors have frequently done so under the burden of an incomplete or inconclusive record of a newly filed case. Typically, a debtor will have determined at the outset of the case that the alleged perils and burdens of having litigation proceed against a related non-debtor justify a request of extraordinary injunctive relief for non-debtors and will make such request in the first few days

after the case has been filed.  *See, e.g., In re Union Tr. Phila., LLC*, 465 B.R. 765 (Bankr. E.D. Pa. 2011); *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009).  Under these circumstances, it is unlikely that there will be a particularly well-developed record on which to rely concerning either the likelihood of proposing a confirmable plan, or the precise nature of the asserted irreparable harm to the debtor, absent an injunction.  *See In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859–60 (6th Cir. 1992) (finding debtor had "some realistic possibility of successfully reorganizing" after only one month in bankruptcy); *In re Union Tr. Phila., LLC*, 465 B.R. at 773 (finding that the "prospects for a successful reorganization remain viable" because debtor had obtained cash collateral and continued to operate its business); *Lyondell Chem. Co.*, 402 B.R. at 590 ("Here the Debtors have so far been successful in doing everything they've needed to do to date. Whether they will be able to address later issues cannot be determined in the earliest weeks of a case.").  For this reason, the debtors requesting an injunction under such circumstances will typically default to a generic, and frankly imprecise, articulation of these standards.[21]

With respect to the "likelihood of confirming a plan" standard, the inquiry becomes a search for any positive signs that the case is off to a reasonably good start—namely, the entry of some "first day orders" generally in the form requested by the debtor, and "stabilization" of the business—which is normally little more than an acknowledgement that that automatic stay thing really works—and the absence of any obvious signs of misconduct by the debtor, or insurmountable "gating" issues to confirmation. *In re Union Tr. Phila.*, 465 B.R. at 773;

---

[21] *See, e.g., Queenie, Ltd. v. Nygard Intern.*, 321 F.3d 282 (2nd Cir. 2003); *In re Union Tr. Phila., LLC*, 465 B.R. 765 (Bankr. E.D. Pa. 2011); *In re Lyondell Chem. Co.*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009); *In re Adelphia Comm'n Corp.*, 302 B.R. 439 (Bankr. S.D.N.Y. 2003); *In re Levitz Furniture Inc.*, 267 B.R. 516 (Bankr. D. Del. 2000).

*Lyondell Chem. Co.*, 402 B.R. at 590; *see in re Sudbury, Inc.*, 140 B.R. 461, 466 (Bankr. N.D. Ohio 1992) (conclusory statement that "the Debtor is hard at work on a reorganization plan").

With respect to the irreparable harm factor, the debtor's presentation frequently does not evaluate the likelihood of specific harm in the litigation to be enjoined, *In re Excel Innovations, Inc.*, 502 F.3d at 1097 (discounting the supposed irreparable harm that would be suffered by the non-debtor affiliate if an arbitration proceeding were to continue), nor at what stage of the litigation such harm is likely to occur.

Rather, all too often, debtors seek an injunction against further prosecution of claims against non-debtors based on generic claims that failure to enjoin these claims will prevent or frustrate the reorganization efforts, and will essentially allow the prosecution of claims against the debtors, frustrating the protections of the automatic stay.

Debtors make such generalized assertions here. Covered Actions Motion at 8–9 (alleged harms to reorganization efforts); *id*. at 7–8 (generally alleged litigation burden); *id*. at 12–13 (generally alleged harms due to preclusive effects and prejudicial findings); *id.* at 19–20 (generally alleged indemnity obligations).

But these scenarios describe an unfortunate, and sub-optimal, reality—at the outset of a bankruptcy case, and without any precise factual indications, it is difficult to predict either the success of a reorganization, or the relative certainty or timing of alleged harm from litigation. These scenarios do not describe a preferred rule of imprecision, nor do they proscribe the court's actual review of the record where, as here, it is more complete, as time has passed, and the confirmation prospects and litigation perils have become clearer. Indeed, the Ninth Circuit in *In re Excel Innovations, Inc.*, cited by the Debtors, the Committee, and the Plaintiffs' Group, directs bankruptcy courts to require some particularized evidence of likelihood of plan

21

confirmation/successful reorganization and alleged irreparable harm. 502 F.3d 1086, 1097 (9th Cir. 2007) (finding an abuse of discretion where the lower court failed to base its decision on evidence in the record). And certainly, *Excel* stands for the proposition that the bankruptcy court should examine the record actually before it in making a decision to grant injunctive relief and not rely on generalities from the initial days of the case. *Id.*

With that preamble, the Court examines the required factors for granting injunctive relief in this case.

### 1. Likelihood Of Success In Reorganizing.

The evidence on the question whether the Debtors are likely to confirm a plan of reorganization in these cases is, frankly, mixed.

On the one hand, the Debtors have been somewhat successful so far, getting some first day orders entered, and the business is "stable" from a revenue versus expense basis. Indeed, as the Debtors contend without serious dispute, the business "pencils out": when operated according to Debtors' business model, the revenues of the business are sufficient to pay the ordinary expenses. Perkins Dec. at para. 15; Covered Actions Motion at 18.

Further, there is no immediate indication that a feasible plan of reorganization is categorically impossible in these cases for the sort of structural reasons that could not be avoided. And, the Debtors have identified the likely means of funding a plan: through the recovery of funds possibly wrongly transferred or up-streamed to affiliates (or non-affiliate affiliates), and they have implemented the first step in pursuing that revenue source: putting in place an independent director to investigate these claims, with competent counsel, prefatory to making demand on the transferees for recovery of the funds and negotiating an acceptable resolution of such disputes. And, to their further credit, after an initial dispute with the

Committee concerning control of the investigation and the Committee's ability to have input therein, the Debtors and the Committee have consensually resolved this very important "process" question.

On the other hand, there are obvious challenges to a feasible reorganization for these cases. First, Debtors appear to lack any means of paying the existing tort claims from the Ledesma Action from existing revenues or assets on hand, or future revenues. The business generally produces revenue sufficient to pay expenses, but there is no cushion to cover what may be extraordinary expenses of litigation awards, which are hardly entirely unforeseeable given the nature of the Debtors' business. And—stunningly—Debtors claim to have no insurance to cover tort claims. Debtors' Reply ISO the Covered Actions Motion at 2 n. 3.

Accordingly, the only identifiable source of funds for a plan that must pay large tort claims emanates from the effort to identify and to recover money allegedly wrongfully transferred to affiliates. At this stage of these cases, we have no material information even concerning the likelihood even of identifying such transfers, let alone indicating a likely "successful" resolution of such claims.

And there are reasons to be skeptical of ultimate success in these cases: as the Ledesma Plaintiffs, the plaintiff complainants named in the "Covered Actions," and the Committee would likely agree, their only focus in these cases will be on obtaining as close to a "full recovery" as possible. The significant creditors in this case (and the Committee whose members are mostly tort claimants) are not trade creditors whose future financial success may be tied to the continuing viability of the Debtors' businesses (which in any event are unlikely themselves to provide meaningful sources of payments re the tort claims in any event) and thus they are not incentivized to take a discount of their allowed claims to facilitate confirmation. For this reason,

23

the significant creditors in these cases may well be able to block the confirmation of any plan that fails to pay them in full while retaining existing ownership (a very complex issue considering the structure of the debtors and non-debtor affiliates family of companies). 11 U.S.C. §§ 1129((b)(2)(B)(i) and (ii).

Relatedly, while the Debtors assert that they have strong grounds for appeal of the judgment in the Ledesma Action, the ultimate outcome of any such appeal is far from certain. And the benefit to be obtained by a successful appeal of the Ledesma Judgment is limited. The basis of the appeal of the Ledesma Judgment is that the Debtors were prejudiced by having to defend numerous unrelated claims in a way that in their view irreparably tainted the process and deprived them of a fair trial. But even if successful, the best outcome for Debtors on such an appeal will not be reversal—as in debtors will have no liability on those claims—but will be vacating and remanding—as in the parties will have to retry as many as ten separate actions, with no guaranteed likelihood of success on the merits.

Secondly, though the court is aware that at least in the Ledesma Action, Plaintiffs were not successful in asserting alter ego-type claims against some of the Debtors' affiliates, it is not clear to the Court that such efforts would not be pursuable in the future, at least against some of the affiliates that were dismissed for lack of personal jurisdiction of the state court.[22] And such efforts would certainly be pursuable by plaintiffs in the Covered Actions. For this reason, creditors in these cases, and creditors of the NDAs, may believe that they would themselves have

---

[22] The Court is mindful of the *Excel* Court's admonition to refrain from speculating about possible injuries a debtor and/or its non-debtor affiliates may face. *In re Excel Innovations, Inc.*, 502 F.3d at 1098. However, there is a distinction to be made here in that the possibility of a Covered Action Defendant asserting future alter-ego claims may impair a proposed plan of reorganization by limiting the transactions which Debtors' Independent Director may ultimately reach. Rather than cite the above proposition to illustrate a speculative irreparable harm, the Court does so in order to highlight a potential stumbling block on the path to the only means of funding a plan that Debtors have proposed to date.

access to claims against transferees of these debtors, complicating the analysis of whether they should simply accept whatever deal the Independent Director may arrange.

Lastly, respecting other hurdles to a potentially feasible plan for these Debtors, the PSC Action, described at section II.C, *supra*, seeks injunctive relief that if successful could, among other things, materially increase the staffing requirements for Debtors' businesses, and thus materially increase the expenses incurred in running the Debtors' businesses. Any material change to the future profitability of the Debtors' business would certainly be a significant factor in assessing the feasibility of the Debtors' plan. And while the outcome of this PSC Action is uncertain, the Debtors do not presently contest that the PSC Action is an exercise of the State's police and regulatory powers that is not subject to the automatic stay, or to intrusion by this court, and it appears that the Debtors may have to take as a given whatever additional obligations or burdens the Superior Court imposes on them for the operation of their heavily regulated businesses.

Overall, the likelihood of the Debtors proposing a confirmable plan of reorganization is at present highly uncertain. The Court simply cannot say, at this stage of these cases, that the Debtors have in any meaningful way carried their burden on this factor. While Debtors here have shown more evidence of a likelihood of reorganization than the Ninth Circuit concluded that the debtors had managed in *Excel*, surpassing the evidentiary showing of debtors in that case is not necessarily difficult. *In re Excel Innovations*, 502 F.3d at 1097 ("The BAP noted that 'Hoffman was actively marketing Excel's products in his consulting position.' That mere fact is insufficient to show that Excel had a reasonable chance of successfully reorganizing."). Nonetheless, the *Excel* court made clear that on a "weak showing on the likelihood of a successful reorganization," Debtor's burden on the irreparable harm element is heightened. *Id*. at 1099.

However, as set forth at section III.C, *infra*, the Court stresses that this determination, and the ruling on the request for a preliminary injunction, are made without prejudice to a subsequent request by the Debtors.

### 2. The Likelihood of Irreparable Harm to the Debtors.

Review of this factor also yields a decidedly mixed picture.

As an initial matter, this Court notes that in determining the appropriateness of a grant of a preliminary injunction in a chapter 11 bankruptcy context, the Ninth Circuit in the *Excel* case essentially ignored the "likelihood of irreparable harm" factor and concentrated instead on the balance of harms between the respective parties. *In re Excel Innovations, Inc.*, 502 F.3d at 1096. However, rather than create a unilateral rule that courts should bypass a requirement that a party seeking a preliminary injunction demonstrate a likelihood or irreparable harm, this Court believes that *Excel* stands for the more limited but no doubt correct proposition that in evaluating a request for injunctive relief, the inquiry must begin with, and ultimately be shaped by, the scope and nature of the requested relief.

In *Excel* the debtor had sought, and been granted, a preliminary injunction against continuing actions against non-debtors through confirmation of a plan of reorganization in the debtor's case. In assessing the entitlement to the relief, the Court noted that the debtor had essentially received everything that they could have asked for via the grant of the injunction: there was no "further" relief that might be sought, and the relief that had been granted, an injunction *through confirmation of a plan*, which would in turn modify permanently the rights of the debtor, the non-debtors and objecting parties inter se, was, as a practical matter, essentially conclusory, rendering essentially irrelevant any inquiry concerning potential irreparable harm. *In re Excel Innovations, Inc.*, 502 F.3d at 1092–93.

26

In contrast, the Debtors here, to their credit, have asked for far less extensive relief, an injunction for 60 to 90 days, simply to permit the Debtors a breathing spell to formulate and propose a plan of reorganization. Under these very different circumstances, this Court believes that the likelihood of irreparable harm if the injunction is not granted is relevant and subject to proof—what is the nature and severity of that harm, and what harm, if any, will occur within the 60 to 90 days that the Debtors have made the relevant measuring period by the scope of their request? Accordingly, the Court will analyze the likelihood of irreparable harm according to the scope of the injunctive relief requested.

The Debtors argue that failure to enjoin the Covered Actions will result in irreparable harm to the Debtors in several ways. First Debtors argue that not enjoining the Covered Actions will frustrate their reorganization efforts because it will divert the Debtors' attention from their efforts to formulate a plan. Second, and more particularly, the Debtors argue that continuation of the Covered Actions against the NDAs will require that Mariner Central participate in the litigation efforts not as a party, but in its capacity as the entity providing administrative services, and likely to have information to be sought by the Plaintiffs in the Covered Actions, and as the party contractually obligated to assist in defending litigation. Third, prosecution of the Covered Actions will implicate Mariner Central's obligations to indemnify NDAs. Fourth, due to the inter-relatedness of the claims against the NDAs and the Debtors (principally Mariner Central), it may result in the entry of preclusive decisions against the debtors. Covered Actions Motion at 1–2; Debtors' Reply ISO Covered Actions Motion at 1; Owen Dec. ISO Motion at 7.

As to the general claim of distraction from reorganization efforts, the Debtors' argument is not particularly convincing. First, there is no precise evidence of senior management distraction because of the pendency of the Covered Actions. Certainly none of the declarations

27

offered in support of this assertion pointed to particularized harm from such distraction. *See, e.g.*, Perkins Dec.; Owen Dec. ISO Motion. As the Ninth Circuit stated in *Excel,* to be convincing, any such harm must be stated with particularity, and not merely asserted generally. *In re Excel Innovations, Inc.,* 502 F.3d at 1098.

Moreover, the Debtors have engaged many highly specialized professionals to assist them in their reorganization efforts, including a highly regarded Chief Restructuring Officer and a highly regarded Independent Director, not to mention two extremely competent law firms well-versed in the intricacies of Chapter 11 reorganizations. Debtors are apparently very well served by these professionals and if there would be any prejudice to the reorganization efforts from continuing to prosecute the Covered Actions, it is not apparent from the Debtors' presentation, or from the history of these cases.

And more fundamentally, given the Debtors' candid admissions concerning the only likely source of funds for payment of the tort claims that are the largest claims against these estates (at least at the moment), it is not entirely clear what would be occupying the Debtors' senior management or their professionals concerning formulating a feasible plan, or otherwise attending to the reorganization efforts, other than insuring that the Independent Director is hard at work, and experiencing no meaningful impediments. Put simply, these are not cases that will require a creative re-imagination of the Debtors' businesses (other than as may be imposed by the PSC Action), nor a sophisticated deployment of the tools made available by the Bankruptcy Code. Thus, the Debtors' generalized claims of potential frustration of their efforts to reorganize are unconvincing.

Concerning the problems raised by the requirement that Mariner Central participate in the litigation against non-debtors, that is not an idle concern. But that concern is at least somewhat

tempered by the same wealth of professional assistance apparently available to Mariner Central that was alluded to with respect to the immediately preceding point concerning Debtors' efforts to reorganize.

Moreover, although Mariner Central appears for now to concede that the automatic stay would not shield them from obligations to respond to discovery requests, or otherwise to assist in the defense effort—not as a named party but as the party with particular knowledge of the subject matter of the litigation—that is a position that may be rethought or brought again to the Court's attention if any such obligations do appear to be burdensome in fact. *See, e.g.*, *In re Excel Innovations, Inc.*, 502 F.3d at 1097–98 (repeatedly citing examples where the record did not support granting relief, but implicitly suggesting that conditions could change in the future). And, as will be discussed more fully below, it is not clear to this court how immediate any such burdens on Mariner Central might be, in light of the extremely preliminary nature of the litigation status of the Covered Actions.

With respect to the indemnity obligations of Mariner Central, several points need to be acknowledged. First, the only evidence provided to the Court on the issue of Mariner Central's obligation to indemnify various non-debtors was the copies of the various Support Agreements between Mariner Central on the one hand and the NDAs operating health care facilities. To the extent that Mariner Central alluded to other sources of an obligation to indemnify or to advance defense costs, such as the Articles of Incorporation or Bylaws of the various entities, such assertions were made without any sort of specific reference to operative language in those documents, let alone copies of the relevant documents. And to the extent that such obligations derive from the provisions of California state law, there was no reference to any such particular statutes, let alone the specific language on which Debtors might rely.

29

Turning to the language of the Support Agreements, there are two important points that must be considered. First, as pointed out by the Plaintiffs Group and as discussed during oral argument, the obligation of Mariner Central to indemnify its counterparty contained in the Support Agreements is not a general obligation to indemnify for any award entered against the counterparty. *See* Supp. Owen Dec. ISO Motion at 181 (Ex. 14, Support Agreement between Mariner Central and Parkview at art. VI). Rather, the obligation imposed on Mariner Central is to "indemnify" the counterparty for any award based on *Mariner Central's* breach of an obligation to the counterparty owing under the Support Agreement. To the extent that such obligation were severable, it is not clear that this "obligation" would even constitute an indemnity under the commonly used meaning of that term. And further to this point, and as also noted during oral argument, the Support Agreement also contains a reciprocal provision, obligating the counterparty to "indemnify" Mariner Central for any violation or breach of a duty owed to Mariner Central by the counterparty under the Support Agreement.[23]

In light of the nature of their respective indemnity obligations, it is inconceivable to this Court that any determination of liability for such an indemnity obligation could be made prior to the entry of judgment in the Covered Actions (or entry of an order summarily adjudicating a matter), an eventuality that is far from certain, and, just as importantly for this analysis, far from ultimate determination.

And of equal importance to the arguments for an injunction, there is absolutely no obligation in the Support Agreement for Mariner Central to defend a counterparty during the course of litigation, or to advance the costs of such defense. Again, similar to the prior

---

[23] Because these claims may well be severable, I do not immediately accept the argument made by the Plaintiffs Group that these indemnity obligations are "offsetting"—they may be, they may not be.

30

discussions, there is no evidence that any alleged obligation to indemnify a counterparty will create any imminent likelihood of irreparable harm to the debtors.

Concerning the inter-relatedness of the claims against Mariner Central and against the non-debtors, this is a very real, if not apparently imminent, danger. And while not necessarily preclusive, we may observe that the outcome of the Ledesma Action is indicative of this danger. In that action, Mariner Central was deemed to be liable for sixty percent (60%) of the damages incurred by Plaintiffs, based assumedly on Mariner Central's responsibility for creating and implementing allegedly deficient standards of care and of review for Parkview patients, and for other factors which caused the trier of fact in the Ledesma Action to conclude that Mariner Central should be deemed to be a "caregiver" under California law.

Without conceding, as Mariner Central should not concede, that a similar outcome would pertain in the Covered Actions, the risk of such an outcome cannot be gainsaid, and is worth material consideration in this analysis. And that is particularly true given the nature of any such potential liability. In the most benign circumstance, the liability for creating an allegedly deficient system of care, which might fall on a central administrative entity, would be separate from liability for defective implementation of such procedures, which might potentially fall on the entity actually operating the facility. And this separate liability could effectively be set with or without the active participation of the entity charged with creating the allegedly deficient standards or procedures. In the less benign case, a trier of fact in the Covered Actions might well conclude, as did the trier of fact in the Ledesma Action, that Mariner Central's role in the operation of the facility warranted finding them to be a caregiver with detrimental consequences for Mariner Central's ultimate liability.

But again, query whether any material peril for any such liability is likely to be fixed in the immediate future?  To be sure, allowing the Covered Actions to proceed to immediate trials, or to permit determinations in the nature of summary adjudications, could easily create the danger of a detrimental preclusive determination against Mariner Central.  But considering the shared understanding of the parties to this dispute that the Covered Actions are all in the very early stages of litigation, there appears to be little if any imminent peril with respect to the Covered Actions.

The Court acknowledges the possibility that allegedly preclusive effects might arise even in the context of initial discovery, though the Court also believes that the Debtors' Covered Actions Motion did not actually identify any such scenarios in the Covered Actions.  Certainly, it should be possible to guard against any such preclusion by, for example, restricting the immediate utilization of such discovery tools as Requests for Admissions.  In addition, the Court notes that, at least under California law (which would pertain here), truly preclusive effects from litigation would only result from the entry of a final judgment, and such judgment would only be afforded preclusive effect if consistent with public policy. *Direct Shopping Network, LLC v. James*, 143 Cal.Rptr.3d 1, 10 (Cal. Ct. App. 2017) (citing *Smith v. ExxonMobil Oil Corp.*, 64 Cal.Rptr.3d 69, 73 (Cal. Ct. App. 2007)) (internal citations omitted). Any court making a determination of the public policy considerations for or against permitting a prior judgment to have preclusive effects against the Debtors would have to conclude that a party who had the protections of a federal bankruptcy automatic stay in not participating in litigation should still be precluded from challenging the prior judgment.

Obviously, this Court is assuming for purposes of this analysis that any alleged irreparable harm to debtors must also be imminent in order to be relevant to the debtors' requests

for injunctive relief. The Court acknowledges Debtors' argument that the case law setting forth the standards for the granting of a preliminary injunction, including one seminal Supreme Court case, do not necessarily require that the irreparable harm alleged be imminent. Debtors' Reply ISO Motion at 6-7. Debtors' argument is not entirely incorrect in the sense that in the *Winter* decision, the Supreme Court did not decide whether the irreparable harm to the party seeking the injunctive relief, the United States Navy, would be—or need be—imminent. But *Winter* was not at all about the *imminence* of harm; it was about the relative certainty of irreparable harm in certain eventualities. *Winter*, 555 U.S. at 25 ("We accept these officers' assertions that the use of [the training and technology at issue] under realistic conditions during training exercises is of the utmost importance to the Navy and the Nation."). Indeed, the imminence or not of the harm in *Winter* was of no consequence, in light of the certainty of the harm that would ensue from a restriction on the training exercises that the Navy had demonstrated were necessary to assure effective combat readiness in the event of military actions, whether they would occur in the next week or the next decade. *Id*. at 26 ("[The technology at issue] is the only reliable technology for" training sailors in anti-submarine warfare, "and the President—the Commander in Chief— has determined that training with active sonar is 'essential to national security.'"). So one may not take from the opinion in *Winter* that imminence of irreparable harm is never required.

More to the point, the decision to order injunctive relief or not must be based upon a fair assessment of the four required factors as they apply to the scenario at hand, including the likelihood of irreparable harm. In this case, debtors allege a likelihood of irreparable harm from the continuation of the Covered Actions; but it should be obvious that litigation proceeds frequently slowly, and certainly incrementally, to its final outcome, and that at this early stage there is simply no identifiable likelihood of irreparable harm.

33

Indeed, this point is well illustrated by the apparently modest nature of the injunctive relief that the debtors have requested: a stay of the Covered Actions for 60 to 90 days, to give the debtors a breathing spell, and the opportunity to propose a plan of reorganization to satisfy the claims against their estates. Measured by the debtors' own request it is obvious that any alleged irreparable harm to be avoided would have to be in danger of occurring within that same 60-to-90-day period, or it would be of no apparent relevance to the request. And certainly nothing has been identified by the Debtors that would both rise to the level of irreparable harm and be likely to occur within the time that Debtors seek an extraordinary respite from litigation against which *they* are already protected.

Again, to the extent that it is the Debtors' burden to demonstrate the likelihood of irreparable harm if a stay is not granted, the Court cannot conclude that the Debtors have met that burden on the current presentation.

### 3. The Balance Of Hardships.

The third factor in the test for a grant of injunctive relief requires the Court to compare the harms likely to be suffered by the Debtors if no injunction is granted with those likely to be suffered by the Covered Actions Defendants if the preliminary injunction is granted. In the bankruptcy context, the Ninth Circuit requires a court to "identify the harms which a preliminary injunction might cause to defendants and . . . weigh these against plaintiff's threatened injury." *In re Excel Innovations, Inc.*, 502 F.3d at 1097 (citing *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 676 (9th Cir. 1988)). This balancing test necessarily coincides with the prior element—the likelihood of irreparable harm—in that the harms alleged by the movant and non-movant must be supported by more than mere speculation. *Id.* at 1098.

34

In brief, Debtors have asserted that the following irreparable harms are likely to occur if a preliminary injunction is denied: (1) a litigation burden that will distract key employees and professionals from reorganization efforts; (2) the burden of the requirement that Mariner Central provide in-house legal services, including responding to discovery requests on behalf of, to the operators; (3) the threat of indemnity responsibilities asserted on behalf of non-debtor entities found liable in the Covered Actions; and (4) the threat of unfavorable judgments, preclusive findings, and general prejudice from continued litigation of the Covered Actions. As noted in section III.B.2, *supra*, whether and when these harms would occur is unclear. But based on the record, the Court considers the threat of unfavorable judgments and preclusive findings to be the most important issues facing Debtors.

On the other hand, delay of the prosecution of the Covered Actions could have a significant deleterious effect on the Covered Actions Defendants, who are primarily elderly individuals, the estates and family members of such individuals, or a combination thereof. Other defendants also include dependent adults[24] and employees or former employees of Debtors and NDAs. Regarding this first category of defendants, the Court notes the personal injuries and other acts alleged in the complaints are traumatic; certainly, anyone who has suffered such events deserves their day in court. And for elderly persons and dependent adults alike, delaying the arrival of that day may be especially significant: the likely declining health of these defendants emphasizes that this day should come sooner rather than later.[25] Similarly, wage and other employment discrimination is a serious issue not to be taken lightly. All workers deserve

---

[24] A "'Dependent Adult' means any person between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights." CAL. WELF. & INST. CODE § 15610.23(a).

[25] The Trial Court in the Ledesma Action granted scheduling preference to certain of these individuals due to their declining health. Between the filing of the complaint and the rendering of the jury verdict, several of the Ledesma Action Plaintiffs passed away.

35

fair compensation and to work in a safe environment. As the *Excel* decision also points out, the delay in prosecution of actions sought to be enjoined is never a "non-factor" in this analysis; rather such delay is always of some import to the effected parties, and courts should examine this potential hardship in light of the relevant circumstances. *See In re Excel Innovations, Inc.*, 502 F.3d at 1097.

The nature of the harms likely to be suffered by Debtors if the preliminary injunction is denied, and that of the harms likely to be suffered by non-movants if the relief is granted, is different. Any harms to be suffered by Debtors, if they were to materialize, could potentially delay and thus impair Debtors' reorganization efforts and affect their ability to continue as a going concern. The Court is not unsympathetic to these concerns.

But more to the point, the hardship to which the Covered Actions Defendants would be subjected by an injunction is of a markedly different character than the potential hardships identified by the Debtors were a stay not granted. Many of the Covered Action Defendants alleged egregious instances of bodily harm, neglect, and both financial and physical abuse. Supp. Owen Dec. ISO Motion at 290–778. Acknowledging the nature of the claims listed in the complaints in the Covered Actions does not reflect this Court's acceptance or rejection of those claims; but it is important to note that if a preliminary injunction were granted, and if it were limited to the duration suggested by Debtors, that could create potential harm to the plaintiffs in those actions, given the varying health conditions of these defendants.

When comparing the harms to be suffered by Debtors with those to be suffered by the non-movants, this factor edges slightly in favor of the non-movants. Accordingly, the Court concludes that the Debtors have not met their burden with respect to this factor.

36

#### 4. Whether a Preliminary Injunction Furthers Some Public Policy.

Generally, a court determining whether to issue a preliminary injunction "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. As previously noted, the *Winter* case concerned whether a preliminary injunction enjoining the U.S. Navy from conducting certain training exercises would negatively affect the public interest. In that case, the Supreme Court repeatedly highlighted grave concerns that allowing the preliminary injunction to stand would inhibit national security and military preparedness. On such facts, the public interest factor can carry considerable weight.

In the bankruptcy context, however, Debtors, argue that this element means promoting the likelihood of a successful reorganization. Covered Actions Motion at 22–23. To support this claim, Debtors rely on one case from the Bankruptcy Court for the District of Delaware: *In re American Film Technologies., Inc.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) (citing *Gathering Restr., Inc. v. First Nat. Bank (In re Gathering Restr., Inc.)*), 79 B.R. 992, 999 (Bankr. N.D. Ind. 1986). A review of the only Delaware Bankruptcy cases to cite *American Film Technologies* for the public interest proposition shows, however, that the Delaware Bankruptcy Courts have not engaged rigorously with this formulation of the public interest element. *See In re SN Liquidation, Inc.*, 388 B.R. 579, 585 (Bankr. D. Del. 2008) (listing but not analyzing the application of the "public interest" element); *In re Integrated Health Servs.*, 281 B.R. 231, 239 (Bankr. D. Del. 2002) (citing *American Film Technologies* for the proposition that "promoting a successful reorganization is one of the most important public interests" before turning to whether debtor had a "legitimate interest in protecting its business from the improper actions of its former employees").

37

The Ninth Circuit, by contrast, has made clear that in the bankruptcy context, a court *may consider* whether the preliminary injunction furthers some public policy on an as needed basis. *In re Excel Innovations*, 502 F.3d at 1089 (emphasis added) (the court should "consider the public interest if warranted"). Further, if this element turned on whether the debtor were likely to reorganize successfully, then this analysis would necessarily collapse the first and fourth elements. Because that would render the public interest factor superfluous, and because Ninth Circuit law is clear, the Court views this factor as discretionary.

In any event, this factor is at best neutral. Debtors argue that the public interest would be served by their reorganization because they provide much needed skilled nursing services to elderly persons from underrepresented or underserved backgrounds. Covered Actions Motion at 22–23. The Covered Actions Defendants, on the other hand, would argue that the public would be better served by the prosecution of their actions because this would shed light on the alleged abuse and wrongful employment practices of Debtors and compensate them for their alleged suffering. From the point of view of Debtors and the non-movants, respectively, each goal would benefit the public.

For these reasons, the Court concludes that the "public interest" factor is neutral in this instance.

Reviewing the four factors required to demonstrate entitlement to injunctive relief, the Court concludes that the Debtors have not met their burdens with respect to the first, second or third factors, and that the fourth factor is not of sufficient consequence to affect the outcome of this matter. Therefore, the Court will deny the Debtors' request for injunctive relief with respect to the Covered Actions.

## C. Some Practical Considerations in Deciding Whether to Grant Injunctive Relief.

And one last, practical note. The Debtors seek a relatively short stay of prosecution of the Covered Actions, 60 to 90 days, to permit them to formulate and to propose a feasible plan of reorganization. The Court has considered this request in light of the requirements for extension of the automatic stay and has concluded that such relief is not favored in this Circuit. The Court has also considered Debtors' requests for a preliminary injunction and has concluded that the Debtors have not met their burdens for such relief based upon the present showing.

In making such a determination the Court is not unmindful of the real-world effects of a court-ordered pause in actions against non-debtors whose eventual participation in a bankruptcy-centric resolution may be of great aid in resolving these cases. Indeed, in a recent opinion that has garnered much attention and commentary, a highly respected bankruptcy judge concluded that he lacked jurisdiction to determine a request for an injunction in favor of non-debtors, based upon admittedly unusual financial arrangements between the debtors and the effected non-debtor that rendered the debtors economically indifferent to the outcome of the relevant disputes. *In re Aearo Tech. LLC*, 642 B.R. 891, 909–912 (Bankr. S.D. Ind. 2022) (describing the effects of a circular indemnity provision whereby debtor was required to indemnify a non-debtor, but that non-debtor provided the funds with which debtor would fulfil the indemnity requirement). But more to the point for this discussion**,** at the conclusion of an exceptionally comprehensive and well-reasoned consideration of the jurisdictional question, the court remarked that it had no doubt but that granting such an injunction might be an enormous aid in facilitating a successful and consensual resolution of the numerous matters for which the injunction had been sought. *Id.* at 912 ("Might a stay influence . . . negotiat[ion of] a global settlement?" "The Court believes the answer" is a "resounding yes."). That potential benefit notwithstanding, that court concluded

39

that such considerations could not influence the outcome of the question before him, in large part because of the jurisdictional nature of the question. *Id.* ("Alas, [this] question [is] not [a thing] to be considered when reviewing the language of §§ 362(a)(1) and (a)(3).").

This Court does not doubt its jurisdiction to decide these matters. But the Court is of two minds about the practical effects of an injunction in these cases, at this moment. It may be that such an injunction would aid discussions with the NDAs and hasten a consensual resolution of this case. It may also be that such an injunction would tilt the "leverage" in these cases in favor of the Debtors and the NDAs in such a way that meaningful negotiations with the Plaintiffs Group and the Committee would be delayed or frustrated. This less positive scenario was alluded to by counsel for the Committee during oral argument on the Covered Actions Motion, who argued that any such 60-to-90-day stay would essentially ensure that the NDAs, at least some of which need to be participants in the effort to provide funds to pay the claims asserted in these cases, would use that time simply to avoid responding to requests that they so participate. Those concerns, which this Court cannot entirely dismiss, suggest that this injunctive relief request is, at least to some extent, part of the exercise of leverage shifting that frequently occurs in the distressed circumstances that pertain in chapter 11 cases. This Court certainly does not decry this possibility—it is too far ingrained in the reality of chapter 11 negotiations to warrant unilateral disapproval—but this concern warrants care in deciding whether to grant the injunctive relief requested here; and it certainly does not support a request for injunctive relief in this case, on the facts as presented at this time.

But time is a long thing;[26] and it may be that facts and circumstances change significantly, and rapidly, in these cases. It may be that Debtors, who have not as of now made

---

[26] WINSTON CHURCHILL, MARLBOROUGH: HIS LIFE AND TIMES (Vol. 1) 18 (Univ. of Chicago Press ed. 2002).

the requisite showing via the Covered Actions Motion that there is a likelihood of successful reorganization, or that they are likely imminently to suffer irreparable harm if an injunction is not granted, will be able to succeed in such demonstrations as these cases develop. And it may even be clearer to the Court on a subsequent showing that negotiations have progressed to a point where injunctive relief is justified, and may even essentially be acquiesced in—if not urged—by the Plaintiffs Group and the Committee. For those reasons the Court stresses that the denial of the Motion is without prejudice to a later effort by the Debtors, based upon a more favorable factual record, or consensual reorganization milieu.

**CONCLUSION**

For all of the above-cited reasons, the Court denies the Motion, without prejudice.

41

## Appendix A

Personal Injury Actions:

1. *Arzeta, et al., v. Parkview, et al.*, Case No. RG19-025110, Sup. Ct. Cal. (Alameda Cty.), June 29, 2020.
2. *Bunch ex rel. Sorrell v. Monterey Palms Operating Co., LP,* Case No. CV-PS-2202058, Sup. Ct. Cal. (Riverside Cty.), May 26, 2022.
3. *Won ex rel. Estate of Chung v. Mariner Health Central, Inc.*, Case No. 22-cv-393351, Sup. Ct. Cal. (Santa Clara Cty.), January 13, 2022.
4. *Doe v. San Rafael Operating Co. LP*, Case No. 22-cv-012984, Sup. Ct. Cal. (Alameda Cty.), June 16, 2022.
5. *Greene ex rel. Greene-Coward v. Parkview Operating Co., LP*, Case No. RG-21-114388, Sup. Ct. Cal. (Alameda Cty.), Sep. 30, 2021.
6. *Huffman v. San Marcos Operating Co., LP*, Case No. 37-2022-17957, Sup. Ct. Cal. (San Diego Cty.), May 9, 2022.
7. *Jackson ex rel. Dewalt v. San Rafael Operating Co. LP*, Case No. CV-22-00662, Sup. Ct. Cal. (Marin Cty.), Mar. 15, 2022.
8. *Margo L. v. Santa Monica Holding Co. GP, LLC*, Case No. 20-ST-CV-42278, Sup. Ct. Cal. (Los Angeles Cty., Cent. Dist.), Nov. 4, 2020.
9. *Lofton ex rel. Jones v. Vale Operating Co., LP*, Case No. C22-00740, Sup. Ct. Cal. (Contra Costa Cty.), Apr. 4, 2022.
10. *Mangano ex rel. Mangano v. Almaden Operating Co., LP*, Case No. 22-cv-401215, Sup. Ct. Cal. (Santa Clara Cty.), July 11, 2022.
11. *Tucker ex rel. Tucker v. Mariner Health Central, Inc.*, Case No. 21-cv-002084, Sup. Ct. Cal. (Alameda Cty.).
12. *Watson ex rel. Guldner v. Fruitvale Long Term Care, LLC*, Case No., Sup. Ct. Cal. (Alameda Cty.).
13. *Watson ex rel. Guldner v. Fruitvale Long Term Care, LLC*, Case No. 22-cv-005675, Sup. Ct. Cal. (Alameda Cty.), Jan. 18, 2022.

## Appendix B:

Employment Discrimination Actions:

1. *Contreras v. Rehabilitation Ctr. of Santa Monica Operating Co., LP*, Case No. 20-ST-CV-18327, Sup. Ct. Cal. (Los Angeles Cty., Cent. Dist.), May 13, 2020.
2. *Cook v. Mariner Health Central, Inc.*, Case No. CV-PS-22-00407, Sup. Ct. Cal. (Riverside Cty.), Jan. 31, 2022.
3. *Flores v. Mariner Health Central, Inc.*, Case No. CV-RI-21-03380, Sup. Ct. Cal. (Riverside Cty.), July 13, 2021
4. *Flores v. Mariner Health Central, Inc.*, Case No CV-PS-21-04890, Sup. Ct. Cal. (Riverside Cty.), Sept. 22, 2021.

COURT SERVICE LIST:

All by ECF.

44